Filed 8/13/25  P. v. Noble CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083365 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN351073) |
| JOHN WESLEY NOBLE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Richard R. Monroy, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.


In 2016, after beginning trial, John Wesley Noble pleaded guilty to second-degree murder and was sentenced to 15 years to life in prison.  The

conviction was related to the murder of Lindell Mitchell on Christmas Eve in 1991. In 2022, after the passage of Senate Bill No. 1437, Noble petitioned for resentencing, asserting he could not be convicted of murder under the current version of the state's laws. The trial court appointed counsel for Noble, determined he had stated a prima facie case for relief, and conducted an evidentiary hearing. Thereafter, the trial court denied Noble's petition, concluding he was "not the actual killer," but "with intent to kill" aided and abetted the murder of Mitchell.

On appeal from the denial of his petition, Noble asserts that the trial court erred by adopting a theory of murder disavowed by the prosecution. In addition, Noble argues insufficient evidence supported the trial court's finding that he directly aided and abetted the murder. As we shall explain, we reject Noble's arguments and affirm the court's order denying his petition for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Underlying Crime & Prosecution*

At the time of Mitchell's death, he and Derwin Hammond were Marines who shared an apartment in Oceanside, California.
On December 24, 1991, sometime between 8:30 and 10:00 p.m., cousins K.A. (age 16) and M.L. (age 15), and their friend Y.D. (who was around the same age) went to a party at Mitchell and Hammond's apartment. Another friend of Mitchell and Hammond, Marcus Jones, was also there, and others were in and out of the apartment during the party.

At some point, Hammond and K.A. got into an argument. At Noble's trial, K.A. testified Hammond was mad that she wanted to leave and that

Hammond pushed her face with his hand.[1] K.A. then threatened Hammond that she was going to get him beaten up and that she would have her brother shoot up the apartment. M.L. told police that K.A. told Hammond to leave because "I'm gonna get your house smoked." Mitchell tried to calm down the situation and shortly after the fight Jones gave the girls a ride home.

During the car ride, K.A. and her friends remained angry. K.A. continued to make threatening remarks about having Hammond beaten up. Jones dropped the girls off at the house of K.A.'s grandmother (and Noble's mother), Mae Smith, in Oceanside. Smith was hosting a holiday party for her family, and K.A.'s uncles James Noble and Noble were there. According to K.A., when the men learned about the argument at Mitchell and Hammond's apartment, they were mad and disgusted. They instructed K.A. and M.L. to get in a car. Noble, his brother James (who K.A. testified is about a foot taller than Noble), K.A., Y.D., M.L., and M.L.'s mother drove to the apartment. According to K.A., Noble and James were agitated and angry during the 15-minute car ride.

When they arrived at the apartment, the group parked on the side of the building, out of sight of the apartment, to surprise Hammond. K.A. testified that M.L., her mother, Noble, and James got out of the vehicle and went to Mitchell and Hammond's door, which M.L. pointed out for them. K.A. did not see her uncles enter the apartment, but shortly after they left, she heard three gunshots. Moments later, Hammond ran out of the apartment with Noble chasing behind him.

The girls and M.L.'s mother got out of the car, and M.L.'s mother yelled "there he goes." Noble and Hammond ran into a nearby vacant lot, and K.A.

---

[1] M.L. told police when she was interviewed about a month after the incident that she saw Hammond slap K.A.

saw Noble repeatedly pistol-whip Hammond, who was rendered unconscious. James and the others followed to where Noble assaulted Hammond. Once Hammond was unconscious they all returned to the car and Noble drove them back to Smith's house.[2]

Shortly after the shooting, police arrived at Mitchell and Hammond's apartment. Investigators catalogued a shoe impression on the exterior of the door below the doorknob and a hole in the opposite wall, which an investigator testified at Noble's preliminary hearing suggested forced entry into the apartment. There was also a bullet hole in the living room wall. There were beer cans and blood stains on the living room floor, and a black baseball hat on the floor that investigators collected. Mitchell's body was lying in the hallway and he had been shot in the back. After the shooting, the police spoke with Jones, Hammond, a neighbor at the apartment building where the incident took place, and M.L. However, the investigation stalled.[3]

Two decades later, in 2011, an agent with the Naval Criminal Investigation Service, Jeffrey Kierman, began investigating Mitchell's death. Initially, Kierman sent evidence collected at the crime scene, including the black baseball hat, for DNA testing. A sample from the hat was entered into a DNA database and returned a match to James. Kierman obtained and executed a warrant to sample James's DNA, confirming his DNA was on the

---

[2] On cross-examination, K.A. testified she had lied to investigators after the shooting and during her own trial—insisting she never returned to the apartment after leaving with Jones—to protect her family and because she was confident she would be acquitted. She decided to testify against Noble because she wanted to set the record straight.

[3] Before Noble was arrested, Hammond was killed in an unrelated homicide.

hat.  Kierman also arrested K.A., and testified at Noble's preliminary hearing that K.A. had been prosecuted and convicted of Mitchell's murder.

After K.A.'s conviction, Kierman obtained a warrant to wiretap the telephones of James, Gloria Noble (K.A.'s mother, and the sister of James and Noble), and another family member.  Kierman also traveled to Arkansas, where he believed Noble was living, to interview him in an effort to instigate conversation about the murder on the wiretapped phones.  Kierman could not find Noble, but did locate a former girlfriend, Kimberly Walker, who had lived with Noble at the time of K.A.'s prosecution.  Kierman interviewed Walker, and she later testified at the preliminary hearing in Noble's case.

During her testimony at the preliminary hearing, Walker stated she met Noble in 2014 while she was in prison in California.  They moved in together in Arkansas in the summer of 2014.  In August or September of 2014, Walker stated that she answered a phone call from Smith, Noble's mother, and gave the phone to Noble.  Noble talked with Smith for 30 to 45 minutes.  After the conversation, Noble seemed "jittery and nervous" and told Walker the police were looking for him.  When Walker questioned him, Noble told her something happened 30 years before.  He explained that K.A. had been beaten by her boyfriend, and that Noble and his brother went to the man's apartment to beat him up and the "wrong person was killed."  Walker testified Noble told him his brother Joe and another brother whose name Walker did not recognize or remember were involved.

Walker also testified Noble told her he was involved in the killing.  On direct examination, Walker stated Noble told her he had killed someone.  Walker said that about two weeks later, Noble left Arkansas and told her he was going to Arizona.

5

Noble was eventually arrested, and in 2016 was charged with Mitchell's murder. The criminal complaint alleged that "[o]n or about and between December 24, 1991 and December 25, 1991, JOHN WESLEY NOBLE did unlawfully murder Lindell Mitchell, a human being, in violation of PENAL CODE SECTION 187(a)." It further alleged that Noble, "although not personally armed with a firearm, was himself a principal in the commission and attempted commission" of the murder "and was vicariously liable, within the meaning of PENAL CODE SECTION 12022(a)(1)."[4]

Noble's trial began on October 20, 2016. In the District Attorney's opening statement, he asserted Noble was not the gunman. The prosecution presented the testimony of four witnesses, Mitchell's wife, Gloria Noble, K.A., and M.L. On the second day of trial, Noble entered a change of plea. Therein, Noble pleaded guilty to the charged crimes in exchange for a sentence of 15 years to life for the murder conviction and a stay of punishment for the violation of section 12022, subdivision (a)(1). On the change of plea form, Noble wrote: "Did aid and abet in the commission of an assault with force likely to cause great bodily injury or death for which murder was a reasonable natural and probable consequence and which resulted in murder. And, I am vicariously liable for a principal being armed with a firearm."

Thereafter, the court sentenced Noble in accordance with the plea agreement.

B. *Resentencing Proceedings*

On September 15, 2022, Noble filed a petition for resentencing under section 1170.95, which was subsequently renumbered section 1172.6. Noble's petition asserted, "[a] complaint, information, or indictment was filed against

---

4       Subsequent undesignated statutory references are to the Penal Code.

[him] that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, or attempted murder under the natural and probable consequences doctrine," that "[he] was convicted of murder, attempted murder, or manslaughter following a trial or [he] accepted a plea offer in lieu of a trial at which [he] could have been convicted of murder or attempted murder," and that he "could not presently be convicted of murder or attempted murder because of changes made to Penal Code [sections] 188 and 189, effective January 1, 2019."

The prosecutor filed an initial response to the petition, agreeing Noble had made a prima facie case for relief and that the court should issue an order to show cause and set an evidentiary hearing. In advance of the hearing, the prosecutor filed a motion to deny the petition. Therein, the People argued Noble had been a "major and direct participant in the murder" of Mitchell, making him ineligible for relief under section 1172.6. In the brief's conclusion, the People stated Noble "was a direct participant in the murder (not an aider/abettor or other indirect participant) with the evidence admissible for consideration in this hearing even proving the defendant himself was the actual gunman who shot Mr. Mitchell to death." The motion indicated the prosecution would rely on the transcripts from Noble's trial and preliminary hearing, any exhibits that were part of those proceedings, and that it might call Kierman to the stand.

Noble's reply to the motion argued that his change of plea indicated he aided and abetted an assault, and during the assault another individual shot and killed Mitchell. Noble argued that he was not a major participant in the

7

assault who acted with reckless indifference to human life. Thus, Noble argued he was eligible for resentencing under section 1172.6.

At the evidentiary hearing on November 16, 2023, the prosecutor asserted the evidence in the record showed beyond a reasonable doubt that Noble "acted with malice aforethought, and/or that [Noble] was the actual killer, and/or that [Noble] was a major participant acting with reckless indifference to human life." The prosecutor pointed to Walker's testimony, in which she stated that Noble admitted he had killed Mitchell, K.A.'s trial testimony, and the recorded interview of M.L. that took place about a month after the shooting, which was played for impeachment purposes during the first day of Noble's trial. The prosecutor asserted that on the night of the killing, Noble drove to Mitchell's apartment and that K.A.'s testimony showed Noble had a gun at the scene of the crime. The prosecutor argued the evidence proved beyond a reasonable doubt that Noble was "the actual killer; and he certainly was a major participant acting with reckless indifference to human life."

During her presentation, Noble's counsel asserted Noble was not the actual killer, and that the prosecutor himself told the jury this in his opening statement at trial. Defense counsel stated that there was evidence that the actual gunman was over six feet tall, and that Noble is only five feet, five inches tall. She noted the black baseball hat found at the scene contained James's DNA, not Noble's, and that James is significantly taller than Noble. Noble's counsel also highlighted the fact that K.A.'s testimony was not reliable, and that she had admitted to lying under oath at her own trial. Noble's counsel argued that while there was evidence that Noble wanted to assault Hammond, there was no evidence Noble went to the apartment

armed, or with any intent to kill, and thus, the People could not sustain their burden under section 1172.6.

In response to defense counsel's argument concerning the prosecutor's statement during his opening statement at trial that Noble was not the actual killer, the prosecutor explained that his statements were not evidence. Further, he said that at the time he began Noble's trial, he had considered different theories about who actually shot Mitchell. But, after hearing the evidence that was presented in the trial before Noble changed his plea, the prosecutor believed Noble was the actual killer. He asserted that if the trial had continued, he would have asked the Court to allow the case to proceed on a first degree murder charge against Noble.

At the conclusion of the hearing, the court took the matter under submission. At the next hearing date, December 14, 2023, the court announced its ruling denying Noble's petition. The court first stated its role was to determine whether Noble (1) "was the actual killer," or (2) "was not the actual killer, but with the intent to kill, aided and abetted the actual killer in that first-degree murder," or (3) "was a major participant in the crime and acted with reckless indifference of that added component of 190.2 (g)(2), as articulated in section 17 in one of those qualifying felonies." The court stated the evidence did not support a finding Noble was the actual killer or "that he was a major participant in one of the listed felonies." The court then found Noble aided and abetted the actual killer, and acted with intent to kill. The court pointed to the evidence showing Noble drove to the apartment, was personally armed, and pistol whipped Hammond after Mitchell was shot. The court concluded Noble "acted with the malice aforethought with the intent to kill and aided and abetted."

Noble timely appealed from the denial order.

9

## DISCUSSION

## I

### *Section 1172.6*

Effective January 1, 2019, the Legislature amended the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Sen. Bill No. 1437; Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).) It redefined "malice" in section 188 to add a requirement that all principals to a murder "shall act with malice aforethought" and that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3), Stats. 2018, ch. 1015, §§ 2–3; *Curiel*, at p. 449; *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

The legislation also narrowed the classes of persons liable for felony murder under section 189. Now, "[a] participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e); *Curiel, supra*, 15 Cal.5th at p. 448.)

The Legislature also put in place a procedural mechanism for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief where the substantive changes made by the legislation affect a defendant's conviction. (*Curiel, supra*, 15 Cal.5th at p. 449.) It includes a petition procedure in which the court decides whether a defendant has made a prima facie showing of entitlement to relief under section 1172.6, subdivision (c). (*Id.* at p. 450.) Once a defendant makes such a showing, the court is required to issue an order to show cause and conduct an evidentiary hearing. (§ 1172.6, subds. (c) & (d)(1); *Curiel*, at p. 450.)

At the evidentiary hearing, the burden of proof is "on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder … under California law as amended by the changes to Section 188 or 189 effective January 1, 2019." (§ 1172.6, subd. (d)(3).) The petitioner and the prosecution may offer new or additional evidence to meet their respective burdens, and the "admission of evidence in the hearing" is "governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (*Ibid.*) Hearsay evidence admitted at a preliminary hearing pursuant to section 872, subdivision (b), however, is excluded from the evidentiary hearing. (§ 1172.6, subd. (d)(3).) "The trial court acts as an independent factfinder in determining whether the People have met their burden." (*People v. Villagrana* (2025) 108 Cal.App.5th 200, 205; *People v. Schell* (2022) 84 Cal.App.5th 437, 442 (*Schell*).)

This court reviews the trial court's denial of a section 1172.6 petition at the evidentiary hearing stage for substantial evidence. (See *People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) Under this standard, our role differs

11

from that of the trial court. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid.*)

In applying this standard, we "review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value— such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*Reyes, supra*, 14 Cal.5th at p. 988.) We will not reverse the order unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 125.) "We must 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'The same standard applies when the conviction rests primarily on circumstantial evidence.' [Citation.] 'An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' " (*Ibid.*)

In addition, under settled appellate principles, we affirm if the trial court's order is correct on any legal theory, regardless of the reasoning in reaching its decision. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [appellate court will consider the correctness of the trial court's ruling, even if given for the wrong reason; " ' "If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion" ' "].)

## II

### *Sufficiency of the Evidence*

On appeal, Noble argues there was insufficient evidence to support the court's finding that he directly aided and abetted the murder of Mitchell. Specifically, Noble argues K.A.'s testimony that she saw him pistol whip Hammond with a handgun after Mitchell was shot, but not kill Hammond, shows he harbored no intent to kill. Noble further argues that the other elements of the crime were not supported by sufficient evidence. The Attorney General responds that the circumstances surrounding the death were sufficient to support a finding that Noble directly aided and abetted Mitchell's murder, either with express or implied malice, and that the evidence otherwise sufficiently supports Noble's murder conviction.

### A

" 'Liability for intentional, target offenses is known as "direct" aider and abettor liability; liability for unintentional, nontarget offenses is known as the " ' "natural and probable consequences' doctrine." ' " [Citation.] 'Senate Bill 1437 [did] not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought.' " (*People v. Medrano* (2021) 68 Cal.App.5th 177, 183.) Prior to Senate Bill No. 1437, "under the natural and probable consequences doctrine, an aider and abettor [could be found] guilty not only of the intended crime[, i.e. target offense], but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) In contrast, a direct aider and abettor "acts 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Chiu* (2014) 59 Cal.4th 155, 161.) In

13

other words, "when guilt does not depend on the natural and probable consequences doctrine … the aider and abettor must know and share the murderous intent of the actual perpetrator." (*McCoy*, at p. 1118.)

Thus, guilt as a direct aider and abettor requires: (1) knowledge of the direct perpetrator's intent to commit the crime; (2) intent to assist in committing the crime; and (3) conduct that in fact assists in committing the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *McCoy, supra*, 25 Cal.4th at p. 1117.) The defendant must not only know the direct perpetrator's intent, but he must share that intent. (*McCoy*, at p. 1118.) Further, the intent required can be express or implied malice. Express malice is shown when the assailant intends to kill or knows to a substantial certainty that death will occur. (§ 188, subd. (a)(1); *People v. Smith* (2005) 37 Cal.4th 733, 739.) Implied malice requires knowledge that conduct endangers the life of another and a conscious disregard for life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181; *Reyes, supra*, 14 Cal.5th at p. 991 [theory of implied malice applies where the aider and abettor aids the direct perpetrator with " 'knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life' "], italics omitted.)

" 'Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea'—which here includes knowledge that the direct perpetrator intends to commit the crime or life-endangering act, 'and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.' " (*Curiel, supra*, 15 Cal.5th at p. 467.)

14

B

Here, the primary dispute is over Noble's mens rea, i.e. whether Noble knew the killer intended to commit murder or a life-endangering act. With respect to a theory of express malice, the Attorney General argues there is ample evidence from which a reasonable trier of fact could infer Noble shared the killer's intent, i.e. that Noble harbored express malice. The People point to: (1) evidence suggesting Noble and James went on a mission to take revenge on Hammond because he slapped their niece; (2) K.A.'s testimony that Noble and James got out of the car and went to Hammond's apartment to harm Hammond; (3) the evidence of a forced entry into the apartment; (4) the existence of gunfire; and (5) Noble chasing down Hammond with a handgun and beating him with the weapon to a state of unconsciousness. In addition, the Attorney General points to Walker's testimony that Noble admitted his involvement in the killing to her.

The Attorney General contends the same evidence also supports direct aiding and abetting liability based on a theory of implied malice. He argues even if Noble was not the actual killer, it is reasonable to conclude Noble knew his brother was armed, particularly based on K.A.'s threats to Hammond that she was sending her relatives to "smoke" his apartment, their retaliatory mission back to the apartment, and Noble's acts of chasing Hammond and beating him.

Noble argues these facts are not "solid, credible evidence" to support a finding he personally knew the actual killer intended to kill or engage in conduct that endangered Mitchell with a conscious disregard for life. Noble highlights the fact that there is no evidence that establishes who the killer was, or whose gun was used. He argues it is possible the gun belonged to Hammond or Mitchell, and that Hammond accidently killed Mitchell.

15

According to Noble, "substantial evidence does not support a finding that a murder even occurred, much less that [Noble] actual[ly] aided the life-endangering act and did so with the requisite knowledge and intent."

We agree with the Attorney General that there was sufficient circumstantial evidence to support the court's finding that Noble directly aided and abetted the murder of Mitchell, and that he harbored the requisite intent to kill. Specifically, the evidence before the trial court showed that: K.A. told Noble and James about her interaction with Hammond and she wanted them to beat up Hammond; directly after that conversation, Noble, James, K.A., Y.D., M.L., and M.L.'s mother drove to Mitchell and Hammond's apartment and parked in an inconspicuous place; during the car ride, Noble and James were agitated and angry about Hammond's conduct; Noble and James forced entry into the apartment where the murder occurred and three gunshots rang out; and, moments after the gunshots, Noble chased Hammond out of the apartment and beat him unconscious with a handgun. Further, Noble admitted to Walker his direct involvement in killing Mitchell decades after the killing occurred, then left town, evidencing a consciousness of guilt.

Critically, "[b]ecause direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts." (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.) Here, the circumstantial evidence before the trial court, including the events leading up to the shooting and directly after, allowed the court to reasonably conclude that Noble went to Hammond's apartment intending to kill Hammond or engage in conduct he knew to be life-endangering.

Noble repeatedly emphasizes the fact that there is no evidence that Noble had a gun before the shooting occurred. However, K.A.'s testimony

16

that Noble used a handgun to beat Hammond after Mitchell was shot was circumstantial evidence that he had a gun all along, or that he used a gun that was in Mitchell and Hammond's apartment. Further, although Noble asserts that his failure to kill Hammond was evidence he harbored no murderous intent, it is just as reasonable to infer that he did intend to kill Hammond since he left him for dead, unconscious in a vacant lot. In essence, Noble asks this court to reassess the evidence presented in the trial court. That, however, is not our role. (See *People v. Avila* (2009) 46 Cal.4th 680, 703 [" 'if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding' "].)

Noble also argues that even if there was sufficient evidence to support a finding of his own malicious intent, there was no evidence showing he knew the actual killer intended to kill, or for that matter who the actual killer was. Noble argues "there is simply no solid, credible support for a finding that [he] had actual knowledge of a murderous plot, at the point he provided aid to a life endangering act, even if, assuming arguendo, he did personally harbor some desire to end *Mr. Hammond's* life." We disagree.

As discussed, the evidence supported the prosecution's theory of the case that K.A. wanted Noble and James—her uncles—to harm Hammond, that they intended to harm Hammond, and they together took action which endangered Hammond's life and inadvertently killed Mitchell in the process. Indeed, Noble himself told Walker that he and his brothers went to Hammond's apartment to beat him up, that the "wrong person was killed," and that he was personally involved in the killing  Further, after making that admission and being informed he was wanted by police in California, he abruptly moved out of his home. Again, taken together, this was sufficient

17

circumstantial evidence of Noble's direct involvement in the shooting and of his knowledge of James's malicious intent.

In sum, we agree with the Attorney General that there was sufficient circumstantial evidence before the trial court to support its findings that Noble directly aided and abetted the murder of Mitchell with the requisite knowledge and intent.

## III

### *Procedural Challenge*

Noble also contends that the court's order must be reversed because the prosecutor did not put him "on notice that he needed to defend against an allegation that he was guilty of murder as a direct aider and abettor who acted with express malice." This argument also lacks merit.

As the Attorney General points out and as the parties discussed at the evidentiary hearing, he was initially prosecuted as a participant in the murder, but not as the actual killer. On the second day of the trial, he pleaded guilty to second-degree murder, and admitted to directly aiding and abetting "an assault with force likely to cause great bodily injury or death for which murder was a reasonable natural and probable consequence and which resulted in murder."

In their motion requesting denial of Noble's petition, the People set forth the correct legal standard, stating they were required to prove "whether there exists a current valid theory of liability under which a petitioner could still be convicted of murder, attempted murder, or manslaughter after the changes made to sections 188 and 189." As noted, the conclusion of the brief also asserted Noble "was a direct participant in the murder (not an aider/abettor or other indirect participant) with the evidence admissible for

18

consideration in this hearing even proving [Noble] himself was the actual gunman who shot Mr. Mitchell to death."

At the evidentiary hearing, the prosecutor correctly repeated the standard under which it was required to proceed, stating "the questions … the People are required to prove beyond a reasonable doubt would be any or all of the following: … that this Defendant acted with malice aforethought, and/or that this Defendant was the actual killer, and/or that this Defendant was a major participant acting with reckless indifference to human life." The prosecutor then stated, "I would purport that the evidence that is admissible at this hearing *proves all three of those* beyond a reasonable doubt." (Italics added.)

Noble's counsel also acknowledged the proper standard in her argument. She refuted the assertion that Noble was the actual killer, and also argued the prosecution could not show evidence of malice or any intent to commit murder on Noble's part. She argued specifically the only " 'malice' or intent or mens rea that [Noble] had … was to commit an assault, not to commit murder, and there is nothing to suggest that this was anything other than a planned assault or that he acted with reckless indifference to human life." The record, thus, makes clear that both parties and the court understood the requirements of section 1172.6 and proceeded accordingly under the statute. Noble's argument on appeal that the prosecutor somehow precluded him from presenting a complete argument concerning his eligibility for resentencing does not accurately reflect the proceedings in the trial court.

In addition, we note that section 1172.6 does not afford petitioners like Noble the same due process protections that might apply in the context of an original criminal prosecution. "Section 1172.6 does not apply any new law retroactively to make formerly innocent conduct criminal. Rather, it looks to

19

whether a defendant could be convicted under current law despite the elimination of certain theories of murder that were available to the prosecution when the defendant was convicted before the enactment of Senate Bill No. 1437. … [¶] … [C]ourts have uniformly held the sentence modification procedure under section 1172.6 to constitute an act of legislative lenity, not a new criminal prosecution." (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1067 (*Hill*).)

"Resentencing under section 1172.6 is a completely voluntary process initiated by the petitioner, which cannot result in additional punishment. [Citation.] It therefore does not implicate double jeopardy concerns, and [provides] no Sixth Amendment right to a jury. [Citations.] Indeed, '[a] petitioner under section 1172.6 does not possess many of the constitutional rights afforded to a criminal defendant at trial.' " (*Hill, supra*, 100 Cal.App.5th at p. 1067; see also *People v. Duran* (2022) 84 Cal.App.5th 920, 931, ["the panoply of rights that attach at trial do not apply during a section 1172.6 evidentiary hearing"]; and *People v. Mitchell* (2022) 81 Cal.App.5th 575, 588 ["Many constitutional protections that characterize burdensome criminal prosecutions thus do not apply in this ameliorative process."].)

In *Schell, supra*, 84 Cal.App.5th 437, which Noble argues supports his argument, the petitioner argued the trial court erred by finding him guilty of second degree murder on a theory that was not presented at his original trial. The Second District rejected this argument, holding that "[i]nterpreting section 1172.6 to allow the prosecution to present different theories of guilt at the evidentiary hearing does not implicate constitutional concerns." (*Id*. at p. 444.) " '[B]ecause a section [1172.6] evidentiary hearing does not subject a defendant to the risk of additional punishment, is not a trial, permits both parties to present new evidence, and merely considers whether the

20

defendant's request for leniency meets the necessary criteria, there is no constitutional problem in allowing new theories of murder liability at that hearing.' " (*Id*. at pp. 444–445.) *Schell* also noted the petitioner "had a full and fair opportunity to present new and additional evidence at the evidentiary hearing but declined to do so." (*Id*. at p. 444.)

*Schell* does not support Noble's argument that he was deprived of due process. Rather, the reasoning in *Schell* supports rejection of Noble's due process argument. "Resentencing under section 1172.6 requires that '[t]he petitioner could not *presently* be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019.' (§ 1172.6, subd. (a)(3), italics added.) At the evidentiary hearing under subdivision (d)(3), the prosecution must prove beyond a reasonable doubt the petitioner is guilty of murder under *current* law notwithstanding the amendments to sections 188 and 189. [Citation.] The trial court thus does not determine guilt, but rather, the petitioner's eligibility for relief under a retroactive sentencing law based on a reasonable doubt standard." (*Hill, supra*, 100 Cal.App.5th at p. 1070.)

That is precisely what the court here did. The fact that the prosecutor argued Noble could also be convicted under current law as the actual killer did not preclude the court from considering other theories of liability, particularly the same theory that had been advanced at Noble's trial and to which he pleaded guilty. Contrary to Noble's assertion, the prosecutor's argument did not deprive him of the opportunity to argue or present new evidence showing his lack of culpability under present law. Accordingly, we conclude there was no violation of his due process rights.

21

## DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:

IRION, J.

RUBIN, J.